ASAHEL W. COGGESHALL *et al. versus* ⸲OSEPH E. READ.

The plaintiff, being owner of one quarter of a ship, took her into his employment at the halves, engaging to fit her out, and to pay to the owners one half of her earnings. She sailed to a foreign port, and on her return voyage was captured by a Columbian privateer, and after a detention of several months was condemned. The Columbian government afterwards paid to the defendant, the owner of another quarter and acting as the agent of all the parties interested, the full value of the ship and of the freight of her return voyage, and also a sum as demurrage, with interest on each item from the day of the capture. It was *held*, that the sum allowed in the name of demurrage ought to be considered as in lieu of the earnings of the ship which were lost by the detention, and that the plaintiff was entitled to five eighths of the sum, viz. to four eighths as charterer, and one eighth as part-owner.

ASSUMPSIT. Plea, the general issue, except as to the sum of 495 dollars and 69 cents, which was brought into court and accepted by the plaintiffs in part satisfaction.

The action was brought to recover the plaintiffs' proportion of the demurrage, received through the United States' government of the Columbian government, for the detention of the schooner Minerva.

At the trial, before *Morton* J., it appeared that the Minerva was owned, one quarter by the plaintiffs and W. Wilde deceased, one quarter by the defendant, and the other two quarters by W. Read and B. W. Brown. The plaintiffs and Wilde took the vessel into their employment at the halves. They were to fit her out, and to pay the owners one half of her earnings. They fitted her out accordingly. She sailed from Somerset to Wilmington, thence to Baltimore, thence to St. Jago de Cuba, and on her return from thence, bound to Philadelphia, she was captured by a Columbian privateer, and after a detention of several months was condemned. The defendant, as agent of the owners, made application to the congress of the United States for relief; in consequence of which, and by means of the interposition of the United States' government, the Columbian government made restitution to the owners and others interested in the vessel and voyage. The defendant, as agent, received 4000 dollars for the vessel, 1000 for loss on the homeward voyage, and 1500 for de-

murrage, with interest from June 27, 1820, the day of the capture, to March 18, 1825. The amount received by the defendant for demurrage, including interest, was 1924 dollars and 68 cents. The crew of the Minerva, during her deten-- tion, were in part subsisted by provisions from the Columbian squadron lying in the port, partly by rations from the Colum- bian government, and partly by provisions on board.

On the 30th of October, 1821, the plaintiffs and the de- fendant, together with the other owners of the Minerva, (except Wilde, who had died,) made a settlement and agree- ment relative to all the concerns of the schooner, in the words following, viz. " Troy, October 30, 1821. This day we the subscribers, owners of the schooner Minerva lately lost on the Spanish Maine, have settled all accounts relative to said schooner that have come to our knowledge. And if any more demands should be brought against said owners, they are to be paid as we own in said schooner, and if any money should be recovered for our claims on the captors of said schooner, we are to receive in proportion as we own in said schooner ; the claims for wages, or victualling said vessel on her last voyage, while W. Wilde was master, to be paid by T. E. Warning and A. W. Coggeshall. Whatever may be recovered for the freight on board said schooner at the time of her capture, is three eighths to J. E. Read, W. Read and B. W. Brown, and five eighths to T. E. Warning and A. W. Coggeshall."

A copy of the memorial made by the defendant as agent of all the surviving owners, and drawn with their knowledge and consent, was made a part of this case.

In the spring of 1821 all the surviving owners fitted out a small vessel to go to the Spanish Maine, to recover some indemnity from the captors ; and all the expenses of this ex- pedition were paid by the several owners according to their interests in the vessel.

In March 1826 the parties entered into a rule of reference, wherein the plaintiffs claimed only five eighths of the de- murrage. This rule was never acted upon.

456     The plaintiffs contended that the fitters were entitled to

the whole amount paid for the demurrage and the defendant contended that the owners were entitled to the whole.

The judge ordered a nonsuit, but if the plaintiffs were entitled to recover any thing further, the defendant agreed to be defaulted, and that judgment should be rendered for the plain tiffs for such sum as the Court, upon the foregoing facts, should adjudge to be due.

*Bacon* insisted that the plaintiffs were entitled to the whole demurrage. They having fitted out the vessel and being liable for the expenses of the crew, were *pro hac vice* the owners. Demurrage is an allowance for a delay of the voyage, and should be paid to the party who suffers by the delay. The owners have received a full compensation for the loss of the vessel. The agreement of October 30, 1821, was not founded on a sufficient consideration and is *nudum pactum ;* but supposing it to be otherwise, on a fair construction it would not deprive the plaintiffs of any part of their claim, for it had no reference to demurrage.

*Cobb* and *Russell, contrà.* Demurrage is a sum to be paid by the freighter for remaining at a place longer than the time specified ; and the charterers can be considered only as freighters, in relation to the owners. The plaintiffs, as charterers, could be damnified only by the loss of the freight, out of which they were to be compensated for the expenses of the voyage ; but they have received indemnity for the loss of the freight. The rest of the loss fell on the owners, and they are entitled to the demurrage as a compensation for being deprived of the use of the vessel for future voyages.

The agreement confirms the position, that the owners were to receive all the indemnity to be recovered, except for the freight. It was made with full knowledge of the memorial which contained a claim for demurrage. It was founded on a sufficient consideration, for it was a settlement of all claims of the several parties, and the stipulations on one side were a consideration for those on the other. If the charterers intended to make this claim, they should have contributed to the expenses of the vessel sent out to recover indemnity from the captors.

*Williams,* in reply, said the plaintiffs had been indemnified

         **457**

Coggeshall  so far as they were interested in the freight, but not for their
v.          expenses at the port where the vessel was detained. The
Read.       owners had no vessel that was delayed, and lost no future
voyages, for their vessel was sold, and at their own price, on
the day on which she was captured.

The opinion of the Court was drawn up by

*April term*  PARKER C. J.  Upon the question referred to us by the
1828, *in*    report of the facts which were proved on the trial of this
*Bristol.*    case, we find it difficult to apply those principles and rules of
decision which in ordinary cases would furnish a very clear
guide to our judgments.

The plaintiffs, together with one Wilde, who died before
the commencement of the suit, were owners of one quarter
of the vessel ; the defendant, with other persons, owned the
other three quarters.  The plaintiffs and Wilde, by a parol
agreement, which however is to have the legal force and
effect of a written instrument of charter-party,[1] had taken
the whole of the vessel into their possession and employment,
and engaged to victual and man her, and in lieu of stipulated
hire or charter were to pay for the use of the vessel one half
of her earnings while in their employment.  By this agree
ment one half of the earnings of three fourths of the vessel
would belong to the defendant and others as owners of the
three fourths, and the other half would belong to the plaintiffs
and Wilde as owners of one fourth and hirers of the residue,
they to be at all the expense of sailing and maintaining the
vessel out of their proportion.  The effect of this agreement
would be, to entitle the plaintiffs and Wilde to five eighths of
the earnings of the vessel and the other owners to three
eighths.  This would have been the proportion of any earnings
of the vessel, had she successfully prosecuted and terminated
the voyage on which she was captured and lost ; for indem-
nity having been recovered and paid over to the defendant,
an owner of one fourth part, who in this respect acted as
agent for the whole, he is bound to distribute from the funds
so received, to the several parties interested, in the like pro-
portion, so far as these funds are applicable to the interests,

---

[1] See *Taggard* v. *Loring*, 16 Mass. R 336; *Wait* v *Gibbs*, 4 Pick. 300.

as before stated, which each party had in the subject matter, to wit, the vessel and the voyage.

And it is understood, that in regard to the value of the vessel, as compensated, and the allowance for freight on her return to this country, an adjustment has taken place, which is satisfactory to the parties, being founded on the foregoing principles.

But besides making compensation for the vessel, the cargo and the freight, a large sum, with interest also allowed, has been paid by the foreign power whose servants made the capture, and received by the defendant, in his capacity of agent for all the parties interested in the vessel and voyage, viz. 1924 dollars and 68 cents. And a controversy has arisen in regard to the disposition of this sum, the plaintiffs claiming for themselves and Wilde the whole as fitters, hirers, or charterers of the vessel, and the defendant claiming to hold the whole for himself and others the owners of the vessel as such, having tendered to the plaintiffs one quarter part of the amount, to which alone he supposes they are entitled as own ers of one fourth part of the vessel.

If this allowance had been made for demurrage, in the common mercantile understanding of that term, and the contract between the parties had been in the usual form of charter-parties of affreightment, and the vessel, after having been detained under capture, had been released and permitted to return home, there would be no difficulty in settling the controversy. In such case, had the charter been for a stipulated price per ton per month, as the hirers would be accountable for the hire until the termination of the voyage, the indemnity for detention and delay would belong to them. But if the vessel had been hired for the voyage without stipulation for time, the same indemnity, or such proportion of it as would be justly referrible to the damage by detention of the vessel only, would belong to the owners of the vessel alone. And in the case before us, apart from some other considerations which will be mentioned, the hirers of the vessel and the owners would seem to be jointly interested in a fund so raised ; the *hirers*, because the detention was to their damage by the increased expense of maintaining the vessel, the *owners*,

Coggeshall
*v.*
Read.

because they would lose the employment and earnings of their vessel during the detention. This would be an equitable and strictly legal distribution as to its principle, and the proportion must be regulated by the degree of damage which the parties would respectively suffer

But the difficulty in the case arises from the nature and apparently extreme liberality of the indemnity made by the *power under whose flag the vessel was captured.*[1] Not only full compensation has been made for the value of the vessel, even as estimated by the owners themselves, but interest on that value has been paid from the day of the capture to March 1825, when the amount was paid over to our government. It would seem clear, therefore, that under this allowance the owners had received full indemnity for the loss of their vessel, and that she may be considered equitably as sold by them at their own price on the day she was captured, and the value then put on interest for them. They suffered nothing therefore from detention, and would seem to have no interest in the sum allowed for that cause. And in regard to their interest in the earnings of the vessel, they would seem to have been fully compensated. Her outward cargo was safely delivered at St. Jago de Cuba, and freight was earned thereon, of which they have undoubtedly received their proportion; and the freight from thence to Philadelphia on her return, has been paid for and distributed, with the interest thereon from the time of the capture. It would seem to follow that the *owners of the vessel, as such, were not entitled to any portion* of this fund; but there are circumstances in this case which afford room for a different view of the subject.

All the parties seem to have considered themselves as jointly interested in whatever sums might be recovered on account of the capture of the vessel. They sent out a vesse at their joint expense to prosecute their claim. They agreed, as in the memorandum in the case, to receive their several proportions of what might be recovered on account of these

---

[1] In cases of capture and restitution by a court of admiralty, the court regulates itself as to demurrage and expenses, by a consideration of all the circumstances. There is no uniform rule as to the amount; but it rests in the exercise of a sound discretion. *The Anna Catherina,* 6 Robinson, 10.

claims, in the proportion as they owned the vessel. In their memorial to congress it appears that they had earnestly urged the Venezuelian government to allow them demurrage, which they stated at 3000 dollars, and this claim appears to have been made generally, and not on account of either of the parties specially. It may be said too, on the part of the owners, that their vessel was prevented by the capture and detention from earning any thing for them for a number of months, and that although the vessel was paid for at a generous price, yet she was not parted with voluntarily by them, and that the plaintiffs had their full proportion of the price of the vessel as owners.

Taking all things into consideration, we are of opinion that this sum allowed in the name of demurrage, ought to be considered as in lieu of the earnings of the vessel which were lost by the detention ; for though there was an allowance upon the same liberal scale for freight home, yet this would have been earned in all probability several months sooner, but for the capture, and therefore there was a loss on this account to the owners.

And this seems to have been the plaintiffs' view of their own rights, for when they agreed to submit the matter to reference, they claimed five eighths only, being the same proportion as they had to claim in the earnings of the vessel. We have therefore come to the conclusion, that the plaintiffs are entitled to five eighths of the sum retained by the defendant. Therefore the nonsuit must be taken off, a default entered, and judgment accordingly, deducting the sum tendered, which has been received.